Good afternoon or good morning. May it please the court, Catherine Essington on behalf of Mr. Cheng. I'd like to reserve two minutes for rebuttal. You may. Mr. Cheng seeks resentencing following his guilty pleas to counts 1 through 6 of the indictment in this case. He asks to be resentenced to the guidelines range of 46 to 57 months as was recommended by the Probation Department and in the PSI. Mr. Cheng contends that his sentence is substantively unreasonable and disproportionate to sentences in similar cases. The standard of renewal was somewhat unclear and this court has yet to definitively say whether an objection is necessary to preserve this issue, but I would argue that the court should follow the majority of circuits that have held that an objection is not necessary and that would have this court review it under an abuse of discretion standard. In cases cited in my brief, including the case of Mr. Hu who received 34 months, Mr. Hu was an employee of MKS Shanghai which was involved in the conspiracy in this case. Mr. Hu, prior to Mr. Cheng's involvement, Mr. Hu and Mr. Cheng, Mr. Hu received a sentence of 34 months. Another similar case is a case again cited in my brief of Mr. Sabuuchi who was convicted of illegal export to Iran. The goods that he was convicted of exporting were very similar in nature to, again, the presser transducers in this case. He was involved in illegally exporting gauges and other flow meters that could be used, that could have nuclear applications. He received a sentence of two years and was actually released as part of the prisoner exchange that was part of the joint comprehensive plan, so he didn't even serve his two years. There's a case of Mr. Vergari who was trying to buy a centrifuge and was illegally selling goods to Iran. He received a sentence of two years. He received a sentence of 33 months. And then there was a case of Ms. Wei who, along with her husband, Mr. Wu, who was convicted of selling military parts to China. She received a sentence of 36 months. What about the Albright testimony which tied your client's activities more closely with the Iranian nuclear program than some of the others? Doesn't that make a critical difference? I don't believe so, Your Honor. I reviewed that testimony extensively last night and there was no, you know, Mr. Albright's, first of all, a lot of his testimony related to a time period that was prior to my client becoming involved. My client's involvement started in 2009. A lot of what Mr. Albright spoke about was Iran's activities, nuclear activities prior to that time period. We also don't have any direct knowledge of where these items went to. Mr. Albright tried to suggest that they went to certain uranium processing plants, but we don't know where these items ended up. So a lot of his testimony was really speculative. But it wasn't speculative as to what your client said, his statements about the possibility of war, we've got to get these things moving. He knew exactly what this was for. He was active in promoting the sale and delivery of these things because he knew what they were going to be used for. Doesn't that put a different gloss on him? I would respectfully disagree to a certain extent. First of all, the activity that he pled guilty to started in 2009. He was already trading with his Iranian counterpart other goods prior to that time. It wasn't until late, at the very end of 2009, that there's any allegation that he was aware, that he did some Google search and was aware that these items had nuclear application. But again, he took responsibility for that. Rather than deterring him, at that point once he knew, he said, boy, you better get these things or there may be a war. Well, again, as I pointed out in my brief, he made one comment referencing a war out of some 39,000 chats with his Iranian counterpart, Jamili. The government makes a big deal of that one particular statement. That was really sales puffery. He was trying to get Jamili to complete orders sooner, and that was his sort of way of trying to get his buyer to act more quickly. You know, the court found that he was really motivated by financial gain and not by any animosity towards the United States. Well, what about his statement where he uses the fuck word? Again, I would suggest that that's one statement out of some 39,000 chats with his Iranian counterpart. But doesn't that show his animosity to the United States? Doesn't that show enough that he was doing this because he knew exactly what he was doing it for and why he was doing it in addition to the profit motive? I respectfully disagree. If you look at the context of that statement, that was actually part of a conversation about currency and the fact that the dollar was, I believe it was dropping, and that he was trying, he was going to see less profits as a result of the valuation of the U.S. dollar. And so that statement was really taken out of context by the government. Again, one statement out of 39,000, and he did take responsibility. If the court looks at his statements of sentencing, which were quite extensive, he apologized, he took responsibility. Warehousing Mr. Chang will be deported when his sentence is served. For an additional five to six years just doesn't serve any further deterrent purpose in this case. He's been in prison since he was apprehended in London in early 2014. As Mr. Albright testified, most of these cases involving illegal exports, the perpetrators face little or no consequences at all. The fact that Mr. Chang was pulled off an airplane in London, detained for almost a year, and then extradited to the United States and given a prison sentence is certainly adequate deterrence in and of itself for others who would think about committing similar crimes. And it's certainly sufficient deterrence for Mr. Chang. Thank you. May it please the court, my name is Stephanie Sigmund, and I'm here on behalf of the government. At the outset, I want to focus on some of the issues that were mentioned by the appellant's counsel that were actually mistaken in the description of what these items were used for. Moments ago, there was some indication that these shipments were not, we didn't know where they went to or what they were used for. Mr. Albright was very clear in the testimony that the shipments that occurred in 2009 did actually assist nuclear weapon development in Iran. That testimony appears in the appendix at page A24, I'm sorry, 224, where he's asked how long Iran was continuing their nuclear weapon development. And that was not based upon just his own knowledge, but it was based upon reports of the International Atomic Energy Association, IAEA, and their research of Iran. And that, as you recall in the testimony, was very clear, is because Iran was found to have been secretly developing a forward out, a nuclear centrifuge facility that was designed for one purpose and one purpose alone, and that was for the development of nuclear weapons. Not for just nuclear energy, but for the development of weapons. And that Mr. Chang knew that he was helping a secret program of Iran, and that was clear from the testimony of all the government exhibits that were emitted during this trial, I mean, sorry, during the sentencing hearing. That was very extensive based upon the testimony of Mr. Albright. The other two things that I wanted to point out was there was clear animosity that Mr. Chang expressed towards the government, the United States government specifically, and he did use the threat of World War III between Iran and the United States to increase his sales over, he mentioned this and how hard it was becoming to get these pressure transducers, which are critical for the development of weapons-grade uranium. That, I think, that fact alone separates this case from the others that were cited to. There's another inaccuracy I wanted to highlight that was contained in the reply brief. Now Mr. Chang contends that his role in this conspiracy and his act in these exports was not sophisticated because he did not remove the serial numbers, the U.S. manufactured serial numbers on the pressure transducers. Now this fact, the fact of the removal of the serial numbers, was something that Mr. Chang himself admitted to during the Rule 11 hearing. So this argument, if it's not waived, it certainly cannot constitute clear and obvious error if the judge based her decision in part on an admission of the defendant. At the Rule 11 hearing, the government provided an extensive factual basis for the plea. And during this statement, and this is at the appendix at page 71 to 72, the government indicated that when the parts were exported from the United States to the People's Republic of China before going on to Iran, Mr. Chang would go into the free trade zone of Shanghai, inspect the parts, and he himself removed the serial numbers, the MKS serial numbers, and he did that to conceal the fact that he and his conspirators were violating U.S. law to avoid suspicion. And then after removing those serial numbers, the parts then were shipped. He caused them to be shipped to Iran. And the judge then asked Mr. Chang, do you agree with these statements? And Mr. Chang says, I agree with them all except one thing, a date. And that's at the appendix at page 75. So he cannot now claim that he did not remove those serial numbers. Now, going back, the court should affirm the sentence of nine years' imprisonment based upon the unique and detailed factual record here. The defendant, Chang, significantly contributed to the advancement of Iran's nuclear weapons program. As I indicated a few moments ago, these parts were critical to the development of weapons of mass destruction. And this is a fact that the defendant himself knew. As demonstrated in the testimony in Government Exhibits 12 and 13, in the sentencing exhibits, he was told by his co-defendant in Iran who the end user was. And the end user, he knew to be a company in Iran that was characterized in the documents he himself saw as a weapons of mass destruction proliferator, a company involved in making nuclear weapons for Iran. Now, as a result of these facts, the district court correctly upwardly departed by six levels. Under Application Note 2 to Section 2M5.1. She aptly described that note, Note 2, as if it was precisely written for this case because all the facts fit the four factors identified in the guidelines. That is, the national security threat was in the extreme level. The volume was huge, 1,185 pressure transducers. What was the period of time? It was over a two-year period of time. So that's a sustained period of time. Yes, Your Honor. Yes, it was over 2009 to 2011 according to the defendant. The indictment said 2012, but that was the correction he made. He made it 2009 to 2011. And this was a critical period of time for Iran's development of weapons of mass destruction. In addition, there was multiple occurrences. There was 11 separate exports and that's also demonstrated in the government exhibit. Now the Sentencing Exhibit No. 1 lays out when all the exports occurred. They ranged in size, 50, 100, and that was because of the instructions that they discussed. They didn't want to get caught, so they didn't want to have a huge number of exports and quantity in any single export. And then the export scheme was highly sophisticated. And Mr. Cheng actually indicated that in an email to Mr. Jamili how this was a very complicated scheme they had to come up with to avoid detection. They used code words, caterpillar, although caterpillar became too long of a word to use, so they changed it to ECI. And so the district court, again, there was no plain error in the district court abruptly departing. And once the court abruptly departed to Level 29, there was no abuse and discretion in her, the district court, then imposing a sentence within the correctly calculated sentencing guideline range. The defense points to some cases that she claims, that the defendant claims, or the appellant claims, are not, that this case is disproportionate with. But those cases are not similar on the facts. There was a case of the young Feng Wang and Zhenzhu Wu. That was a Chinese case. And even the judge, the same district court judge, handled those cases as this one. And she said the parts in that case were not as dangerous as nuclear weapons. And that's why she felt it necessary to deter others from doing similar conduct as Cheng did. With regards to this Peng Wuxi case, those cases were industrial parts that were commercially available. They were not controlled for nuclear proliferation under nuclear proliferation controls like the pressure transducers here. The case of the Gary, it's not actually clear, based on the publicly available information, what parts were illegally exported in that case. There may have been an attempt for a centrifuge, but centrifuges also are medical centrifuges and that wasn't necessarily a nuclear centrifuge. With regards to Wu, the other defendant that was mentioned, he did not know, have any knowledge of the parts going to Iran. He did know that they went to unauthorized end-users in the People's Republic of China, but he did not have any knowledge, and the record's clear, of any parts going to Iran. That was something that Cheng did know, as well as Jim Milley. And obviously he knew about who the end-user was. And again, this case is very unique. It's outside the heartland of the cases that the 2M5.1 guideline of Base Pencil Level 26 was designed to address and the Application Note 2 squarely allows upward or downward departures in when cases are in the extreme like this one. Thank you. If there's no further questions? Thank you. Just a couple of points. With respect to the serial numbers, I don't think it's a big issue, but Mr. Cheng has never said that he removed the serial numbers, and in fact, there's chats that indicate that Mr. Ping, one of the undicted, unnamed Chinese co-conspirators in this case actually removed them. Mr. Cheng did admit to removing shipping labels, but that he has always denied that he removed serial numbers. Well, do you deny that he made the response to the judge following the statement of factual basis that she described a moment ago? Your Honor, he may have failed  that statement of the government, but he, I think the record in the government's own sentencing exhibits including the chats indicate that he removed the serial numbers and he did indicate that the serial numbers were removed by Mr. Ping. So, I don't think he made an affirmative admission that he may have failed to correct the government on that point. But I think it's important only in the sense that it goes to one of my other arguments which is that the district court judge erred in finding that the level of planning and sophistication was present in extreme form under application no. 2. Basically, with Mr. Chang's involvement, he was a middle man. The court found that he was a middle man. The MKS Shanghai people were involved in the scheme well before Mr. Chang came on the scene and basically his role was simply to be the middle man between the Husserani counterpart and MKS Shanghai and Mr. Ping and simply reroute these shipments, remove the labels from the boxes and then route them through Hong Kong to Iran. That was his sole involvement and that doesn't require a lot of planning or sophistication and is very similar to the conduct of Mr. Tsai which is the third circuit case. Thank you.